UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

KRISTEN M. DOUGHTY,                    :
      *Plaintiff*                           :
                                       :
v.                                     :        C.A. No. 25-cv-
                                        :
SOUTH COUNTY HOSPITAL                  :        **Jury Trial Demanded**
HEALTHCARE SYSTEM, alias               :
      *Defendant*                           :
                                        :

## COMPLAINT

### I.    Introduction

This action is brought by the Plaintiff, Kristen M. Doughty, against her former employer, South County Hospital Healthcare System, alias, seeking compensatory, punitive, and liquidated damages, as well as attorneys' fees, litigation expenses and other equitable relief, arising out of Defendant's violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*., and the Rhode Island Parental and Family Medical Leave Act ("RIPFMLA") R.I. Gen. Laws § 28-48-1, *et seq.*

### II.    Parties

1.    Plaintiff Kristen M. Doughty ("Plaintiff") is a resident of the Town of South Kingstown, County of Washington, and State of Rhode Island.

2.    Defendant South County Hospital Healthcare System, alias ("Defendant") is a corporation duly authorized and organized under the laws of the State of Rhode Island with a primary place of business at 100 Kenyon Ave., South Kingstown, Rhode Island.

3.    At all relevant times, Defendant was an employer as defined under the FMLA and RIPFMLA.

**Page 1 of 19**

### III.    Jurisdiction

4.    The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case under the provisions of 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law; specifically, the FMLA.

5.    Supplemental jurisdiction over the state law claim set forth herein is predicated on 28 U.S.C. § 1367 as it arises out of the same case or controversy.

### IV.    Venue

6.    Venue is proper in this Court insofar as Defendant is doing business in Rhode Island and therefore is deemed to reside in the District of Rhode Island and a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. § 1391.

### V.    Material Facts

#### *Factual Background*

7.    Plaintiff was employed by Defendant as a Medical Assistant/Medical Receptionist from on or about March 14, 2016, until on or about August 6, 2024.

8.    During this entire period of employment, Plaintiff worked at the Center for Women's Health, a subsection of Defendant's operation that had its own operations and procedures that were not always the same as those of the broader Defendant South County Health.

9.    Plaintiff's duties as a Medical Assistant/Medical Receptionist included checking-in patients, ensuring patients provided needed information, registering new patients, including substantial paperwork, scanning patient records into medical charts, verifying insurance information, working with medical providers to schedule or reschedule appointments and

**Page 2 of 19**

procedures, and answering phones for the Center for Women's Health, including calls pertaining to urgent/emergent needs for care.

10.     Plaintiff was a loyal, experienced, and productive employee of Defendant without any recent discipline or purported work deficiencies.

11.     At all times prior to the events below, Plaintiff received outstanding performance reviews each year.

12.     Plaintiff managed this impressive performance despite chronic short-staffing issues with Medical Assistants/Medical Receptionists, which made it difficult and sometimes impossible to complete all the necessary work during each shift.

### *Protected Leave for Plaintiff's Mother*

13.     Prior to the events described below, Plaintiff's mother was diagnosed with cancer.

14.     In or about the fall of 2023, Plaintiff's mother's cancer was determined to be terminal.

15.     On or about October 5, 2023, Plaintiff began the process of requesting leave under the FMLA and RIPFMLA to care for her mother and gathering the documentation needed to support the leave request.

16.     Plaintiff completed the required paperwork on or about October 17, 2023, requesting intermittent leave as needed to care for her mother due to her terminal illness.

17.     Plaintiff was subsequently granted the requested FMLA/RIPFMLA leave.

18.     Plaintiff used her FMLA/RIPFMLA leave infrequently, approximately once every two (2) weeks for a day or less each time.

19.     Each time she used FMLA/RIPMLA leave, Plaintiff emailed and/or called one of her supervisors, Christine Cabral ("Ms. Cabral"), informing her of the same.

20.     Because Ms. Cabral lived in an area with poor cellphone reception, Plaintiff was often unable to speak with Ms. Cabral directly and would leave a voicemail.

21.     When Plaintiff contacted Ms. Cabral in this way, she usually did not specify the purpose of her leave, other than to note that it was due to her mother's condition for which Plaintiff had been granted FMLA/RIPFMLA leave.

22.     At no time did Defendant, Ms. Cabral, or anyone else indicate that Plaintiff was failing to follow procedures or using her leave inappropriately by contacting Ms. Cabral when she would not be able to work.

23.     Indeed, every time Plaintiff used her leave in this manner, Ms. Cabral either said nothing or indicated that she had received Plaintiff's communication without further discussion.

### *December 18, 2023, and January 15, 2024, Staff Meetings*

24.     On December 18, 2023, Plaintiff attended a staff meeting with (among others) Ms. Cabral and Drew Ross ("Mr. Ross"), a pharmacist employed by Defendant who was, at that time, also one of Plaintiff's supervisors.

25.     During the meeting, Plaintiff expressed frustration that Mr. Ross did not have a background in women's health (having transferred from Defendant's Pharmacy Department), did not appear to know what to do when one of the doctors were called away on an emergency, and had been delegating work that was his responsibility to the Medical Assistants/Medical Receptionists, who were already understaffed, overworked, and often unable to complete all of their duties and work.

26.     Plaintiff noted in that meeting that the result was that Medical Assistants/Medical Receptionists were having to make scheduling decisions for the doctors in the Center for Women's Health that should have been made by Mr. Ross, which negatively impacted their ability to perform their usual duties.

27. Plaintiff noted in that meeting that Medical Assistants/Medical Receptionists making Mr. Ross' scheduling decisions had become so common and widely known that the doctors in the Center for Women's Health had begun sending their time off requests directly to the Medical Assistants/Medical Receptionists instead of Mr. Ross.

28. At the time, Ms. Cabral had indicated that she felt that Mr. Ross's delegations were proper but otherwise did not address the comment.

29. Coincidentally, Plaintiff had other time sensitive work that needed to be done on December 18, 2023, and left the staff meeting early to attend to her work.

30. This was a common occurrence, and Medical Assistant/Medical Receptionist routinely left staff meetings early when they had other work that needed to be done without ever previously being disciplined for or warned against the same.

31. Indeed, as was typical when someone needed to leave a staff meeting early, no one indicated that Plaintiff needed to stay or asked where she was going when she left the staff meeting on December 18, 2023, nor did anyone follow up with her that day to indicate she had done anything wrong.

32. The following day, December 19, 2023, Plaintiff was ill and called Ms. Cabral to inform her of the same, as was typical in such situations.

33. Neither Ms. Cabral nor Mr. Drew mentioned the meeting nor Plaintiff's sick day for nearly a month.

34. On January 15, 2024, a second staff meeting was scheduled for 5:00 pm.

35. While Plaintiff would normally be expected to attend this staff meeting, one of the doctors in the Women's Health Center had scheduled patient appointments until approximately 6:00 pm on that day and required a Medical Assistant/Medical Receptionist to stay on duty to help process the same.

**Page 5 of 19**

36.   This was a somewhat regular occurrence, and neither Plaintiff nor any other Medical Assistant/Medical Receptionist had been disciplined for or even warned against missing a staff meeting when needed to work late.

37.   As it happened, Plaintiff was the Medical Assistant/Medical Receptionist who ended up working late with the doctor, and consequently missed the January 15, 2024, staff meeting.

### Initial Retaliation

38.   On January 17, 2024, at approximately 2:00 pm, Plaintiff was called into a meeting with Ms. Cabral and Mr. Ross.

39.   Although Plaintiff did not initially know the purpose of the meeting, it was soon revealed that it was to address Plaintiff's "inappropriate" comments regarding Mr. Drew during the December 18, 2023 staff meeting, her "not being reachable" during her December 19, 2023 sick day, and her "failure" to attend the January 15, 2024 staff meeting.

40.   With regard to the first, Plaintiff responded that she stood by her earlier assessment as Mr. Ross's delegations were preventing the Medical Assistants/Medical Receptionists from completing all of their duties, especially given that they were already short-staffed.

41.   Ms. Cabral retorted that the staffing problems were due to the fact "that there [were] so many FMLAs" at the hospital, referring to workers with approved FMLA and/or RIPFMLA leaves, and that the use of FMLA/RIPFMLA leave by employees was "causing problems" for Defendant.

42.   It was clear from Ms. Cabral's comments that Plaintiff's prior use of FMLA/RIPFMLA was viewed as a problem rather than a legal entitlement.

43.    Plaintiff did not point out that she believed she was being targeted based on her use of FMLA/RIPFMLA in an attempt to resolve the meeting diplomatically.

44.    With regard to her sick day, Plaintiff stated that she had not received a call from Ms. Cabral on December 19, 2023, but reiterated that she had been too ill to come into work that day.

45.    With regard to missing the January 15, 2024, staff meeting, Plaintiff explained that she was working with a doctor who had scheduled patients late in the day and was needed there, as had been the case for both Plaintiff and others previously without issue.

46.    Plaintiff was ultimately presented with a "Corrective Action Form" and asked to sign the same to confirm that Ms. Cabral and Mr. Drew had met with her regarding what they characterized her "unprofessional" behavior.

47.    Moreover, although Plaintiff had not been the subject of any recent formal discipline, she noted that the corrective action form was listed as being a "final written warning."

48.    This skipped several levels of progressive discipline that were typically imposed prior to a final written warning, including multiple verbal warnings, at least one written warning, and, in extreme circumstances, brief unpaid suspensions.

49.    Although Plaintiff felt that the information was incomplete and was surprised that her first disciplinary "incident" was immediately escalated to a final written warning, she signed the form anyway, as she was already being accused of being uncooperative and believed that resisting signing would only make things worse for herself.

50.    Part of the reason Plaintiff was willing to sign the form, incomplete as it was, was that she would be given a chance to give a complete response to "Section 2" of the form, which essentially solicited the employee's side of the story, and could re-sign the corrective action form at that time.

51.    However, Plaintiff was never given the opportunity to fill out Section Two beyond a one-line response, reiterating that she was sick on December 19, 2023.

### Changes Following Protected Leave for Plaintff's Mother

52.    On or about February 22, 2024, Plaintiff's mother passed away from cancer.

53.    During the next month, Plaintiff did not have occasion to use FMLA/RIPFMLA leave.

54.    During that month, Mr. Ross was demoted and/or transferred to another role and subsequently terminated by Defendant.

55.    Upon information and belief, this was due in whole or in part to the issues with improper delegation that Plaintiff had identified in the earlier meeting.

56.    Also during the same month, Defendant's employee LaDawn Marafitte ("Ms. Marafitte") was placed in charge of the Medical Assistants/Medical Receptionists, including Plaintiff.

57.    Ms. Marafitte often worked in a different location than Plaintiff, and the two would only see each other, on average, once every two (2) weeks.

### Protected Leave to Care for Plaintiff's Husband

58.    Tragically, on or about March 19, 2024, Plaintiff learned that her husband likely had cancer, and he was scheduled for a biopsy on March 22, 2024.

59.    Based on her recent experience with her mother, Plaintiff anticipated that she would need to take FMLA/RIPFMLA leave to assist her husband through his treatment if his diagnosis was confirmed.

60.    On or about March 19, 2024, Plaintiff informed Ms. Marafitte of her husband's health concerns and her likely need to take FMLA/RIPFMLA leave in the near future.

61.     Ms. Marafitte responded by expressing frustration with how many employees who reported to her were on FMLA/RIPFLMA leave, and how difficult it was for her to keep track of all such employees.

62.     On or about March 24, 2024, Plaintiff's husband's cancer diagnosis was confirmed, and Plaintiff learned that he would require radiation and chemotherapy until at least June 21, 2024.

63.     Once again, Plaintiff collected the necessary documentation to apply for intermittent FMLA/RIPFMLA leave in order to care for her husband during his treatment for his serious medical condition.

64.     Plaintiff submitted the same to Defendant on or about April 26, 2024, requesting intermittent leave through June 21, 2024.

65.     Plaintiff's request for intermittent FMLA/RIPFMLA leave was ultimately granted.

66.     When Plaintiff used her intermittent leave for her husband, she would report each use to Ms. Marafitte.

67.     Depending on how much notice Plaintiff had of her need to take intermittent leave, Plaintiff would email Ms. Marafitte from her work email about any such leave, or call or text from her personal cell phone if she was not at work when she learned that she would need to take leave.

68.     Initially, Plaintiff required FMLA/RIPFMLA leave approximately once a week.

69.     However, Plaintiff's husband's progress was slower than anticipated and he continued to receive treatment through July and August 2024.

70.     As Plaintiff's husband received more treatment, he required additional care from Plaintiff.

**Page 9 of 19**

71.    As a result, Plaintiff informed Defendant that she would soon be applying for an extension to her FMLA/RIPFMLA leave.

72.    Due to her husband's increased need for care, it was necessary for Plaintiff to take a significant amount of leave in late July 2024, totaling approximately two (2) weeks of leave taken in three (3) intervals of a few days each.

### *Additional Retaliation and Pretextual Discharge*

73.    Shortly thereafter, on August 5, 2024, Ms. Marafitte came into Plaintiff's workspace and criticized Plaintiff for not taking overflow calls from the hospital call center.

74.    Taking such calls was not a part of Plaintiff's job duties.

75.    At no time prior to this had Plaintiff or any other Medical Assistants/Medical Receptionists in her office taken overflow calls from the hospital call center, been asked to do so, or criticized for failing to do so.

76.    Indeed, Plaintiff's phone was not even capable of receiving transferred calls from the hospital call center.

77.    Plaintiff and a coworker, Lynn Petrone ("Ms. Petrone"), explained to Ms. Marafitte that the phones they used were not set up to take such calls.

78.     Plaintiff and Ms. Petrone also explained that even if it were possible to take such calls, the majority of patients and calls coming through their office were in regard to emergency situations or were otherwise urgent for health reasons, and that it would be inadvisable to funnel non-emergency patient calls from the call center through their lines.

79.    Both of these explanations were in the context of chronic short staffing for Medical Assistants/Medical Receptionists at Defendant's Center for Women's Health and the resulting backlogs of work that were already occurring, of which Ms. Marafitte was well aware.

80.     Notwithstanding, Ms. Marafitte insisted that Plaintiff begin taking overflow calls from the hospital call center, telling Plaintiff and Ms. Petrone to, "make the patient[s] wait."

81.     Within fifteen (15) minutes, IT personnel came to Plaintiff's workspace and enabled her phone to take overflow calls from the hospital call center.

82.     Due to the large volume of calls that began coming in from the hospital call center, Plaintiff struggled to perform both those additional duties assigned by Ms. Marafitte and her usual urgent/emergency work regarding intra-healthcare system calls as well as all her other duties.

83.     Plaintiff approached Ms. Marafitte about the situation in an attempt to resolve the same.

84.     Ms. Marafitte's response was, "Kristen, I don't want to hear it.  Just answer the phones."

85.     Plaintiff continued to ask Ms. Marafitte how to balance the urgent/emergency calls with the overflow calls.

86.     Ms. Marafitte began ignoring Plaintiff's questions and, approximately five (5) minutes after Plaintiff first reported difficulty answering overflow calls in addition to her usual urgent/emergency duties, left Plaintiff's workspace.

87.     A few minutes later Ms. Marafitte returned with Ms. Cabral to confront Plaintiff about performing her usual duties and the additional overflow work from the hospital call center.

88.     During this confrontation, Plaintiff asked Ms. Cabral how she was supposed to perform the additional overflow work, her urgent/emergency duties, and all her other duties, in a timely manner without risking their patient's health and/or derailing the operations of the Center for Women's Health.

89.     Ms. Cabral was unable to answer Plaintiff's questions.

**Page 11 of 19**

90.    During the confrontation, Plaintiff's phone began to ring.

91.    Although she was in mid-conversation with Plaintiff, Ms. Marafitte began berating Plaintiff, saying, "Are you going to answer the phone?  Why aren't you answering the phone?"

92.    Between being aggressively confronted by her supervisors, being denied any guidance on how to keep up with urgent/emergency calls and her normal duties, along with the new extra overflow work, and being berated by Ms. Marafitte about not answering the phone while in the midst of said confrontation, Plaintiff began to feel sick to her stomach and was afraid she might vomit.

93.    Plaintiff explained that she felt sick, that she needed a moment, and could not answer the phone at that precise moment and proceeded to walk to the nearby kitchen area.

94.    The kitchen area was within earshot of Plaintiff's workstation.

95.    Neither Ms. Marafitte, Ms. Cabral, nor anyone else indicated that Plaintiff was doing anything wrong by taking space to avoid vomiting on or in the immediate proximity of others.

96.    Within a minute or two, Ms. Marafitte called Plaintiff into an empty office.

97.    When Plaintiff entered the office, there was an HR employee with Ms. Marafitte.

98.    Ms. Marafitte and the HR person told Plaintiff to go home.

99.    At no time did Plaintiff act in any manner that could reasonably be described or interpreted as inappropriate, insubordinate, or unprofessional.

100.    The next day, Plaintiff received a call from Ms. Marafitte and Tyler Toolan, another HR employee, who informed her that she was fired for "inappropriate and unprofessional conduct."

101.    Ms. Marafitte and Mr. Toolan asked Plaintiff if she had anything she wanted to say for herself.

102.    Plaintiff asked if there was anything she could do to change the decision and was told that there was not.

103.    Plaintiff responded that, given she could not change the decision, she had nothing to add.

104.    Plaintiff subsequently learned that a second corrective action form was prepared relative to her termination.

105.    Unlike before, and as was Defendant's standard practice, Plaintiff was not asked to give her side of the story or to sign the corrective action form before the decision was made to terminate her.

*Progressive Discipline for Other Instances of "Inappropriate and Unprofessional Conduct"*

106.    Prior to Plaintiff's firing, other employees similarly situated to herself had been disciplined for inappropriate and/or unprofessional conduct.

107.    However, nearly all such employees were sent home early without pay for the unworked portion of the day, before returning to their next regularly scheduled shift.

108.    In the few cases where such employees were not so disciplined, they were suspended without pay for a few working days before returning to work.

109.    No employee similarly situated to Plaintiff had been fired merely for verbal remarks, even when they truly were inappropriate and/or unprofessional.

## VI.    General Employment Law Allegations

### *Violation of the FMLA and RIPFMLA*

110.    At all relevant times, Plaintiff had a parent and/or spouse with a serious health condition as defined under the FMLA.

111.    At all relevant times, Plaintiff had a parent and/or spouse with a serious illness as defined under the RIPFMLA.

112.    Defendant's termination of Plaintiff shortly after she announced the need for and used additional FMLA/RIPFMLA medical leave gives rise to a *prima facie* case of unlawful interference with Plaintiff exercising her rights under the FMLA and RIPFMLA.

113.    Defendant's termination of Plaintiff after she took an approved FMLA/RIPFMLA medical leave and her announcement for and ongoing use of additional leave gives rise to a *prima facie* case of unlawful discrimination against Plaintiff for exercising her rights under the FMLA and RIPFMLA.

114.    Defendant's termination of Plaintiff after she took an approved FMLA/RIPFMLA medical leave and announcement for and ongoing use of additional leave gives rise to a *prima facie* case of unlawful retaliation against Plaintiff for exercising her rights under the FMLA and RIPFMLA.

115.    Defendant's decision to terminate Plaintiff's employment was clearly made after Plaintiff placed Defendant on notice that she would need FMLA/RIPFMLA leave and had in fact utilized such leave.

### *Retaliation*

116.    In addition, Defendant retaliated against Plaintiff by causing her to suffer the adverse employment actions alleged above, evidenced by termination, in response to Plaintiff's request for and use of her entitlement to protect family medical leave.

117.    When Plaintiff requested her initial leave of absence, extensions to her leave of absence, and made use of the leave she was entitled to and approved to take, she was engaged in protected activity.

118. The temporal proximity between Plaintiff's request for and use of FMLA/RIPFMLA leave and her termination, even if sparingly used, provides compelling evidence that Defendant took such action in retaliation of such protected activity.

119. The sudden emergence of exaggerated "disciplinary issues" in the midst of Plaintiff's use of FMLA/RIPFMLA leave provides compelling evidence that Defendant took such action in retaliation of such protected activity.

120. The fact that Defendant waited approximately one (1) month before taking action on the first of the sudden "disciplinary issues" described above provides compelling evidence that the same were pretextual and that Defendant in fact took such action in retaliation for protected activity under the FMLA and RIPFMLA.

121. The fact that Defendant departed from its usual progressive discipline procedure with regard to sudden "disciplinary issues" described above provides compelling evidence that the same were pretextual and that Defendant in fact took such action in retaliation for protected activity under the FMLA and RIPFMLA.

122. The repeated hostile comments about and classification of FMLA/RIPFMLA takers as problems by both Ms. Cabral and Ms. Marafitte also provide compelling evidence that Defendant took such action in retaliation for such protected activity.

123. Defendant's actions caused Plaintiff to suffer further emotional distress and other damages.

### *Pretext and Discriminatory Animus*

124. Defendant's discriminatory animus against Plaintiff on account of her prior and anticipated future use of FMLA/RIPFMLA leave and others who utilized FMLA/RIPFMLA leave is directly established by, among other things, a) Ms. Cabral's comments that too many employees were using FMLA leave and that it was "causing [Defendant] problems;" b) Ms.

Marafitte's expressions of frustration with Plaintiff's use of FMLA/RIPFMLA leave; and c) Ms. Marafitte's comments to the effect that too many employees were utilizing FMLA/RIPFMLA entitlements.

125. Defendant's intent to discriminate against Plaintiff on account of her prior and anticipated future use of FMLA/RIPFMLA leave is further established, in part, by conduct evidencing that Defendant's reasons for terminating her were pretextual and that discrimination motivated its decision, including: a) failure to follow and/or deviation from its own policies, procedures, and practices, relative to, among other things, progressive discipline and medical leave; b) asserting false justifications for her termination; c) treating Plaintiff differently than other similarly situated employees; and d) asserting implausible, inconsistent, and contradictory justifications for her termination.

126. The temporal proximity of when Plaintiff was given sudden and inexplicable discipline for her conduct surrounding the December 18, 2023, and January 15, 2024, staff meetings in relation to her use of her FMLA/RIPFMLA leave for her mother, approximately two (2) months, supports an inference of discriminatory and retaliatory intent.

127. This is especially the case given that Defendant inexplicably took nearly one (1) full month to address any of the alleged "issues" it had with Plaintiff's conduct in the December 18, 2023, staff meeting.

128. The temporal proximity of when Plaintiff was given a sudden and inexplicable increase of work to perform and then almost immediately fired for expressing concerns about the same in relation to her use of her FMLA/RIPFMLA leave for her mother, approximately five (5) months, supports an inference of discriminatory and retaliatory intent.

129. The temporal proximity of when Plaintiff was given a sudden and inexplicable increase of work to perform and then almost immediately fired for expressing concerns about the

same in relation to her request for and commencement of her FMLA/RIPFMLA leave for her husband, approximately four (4) months, supports an inference of discriminatory and retaliatory intent.

130.    The temporal proximity of when Plaintiff was given a sudden and inexplicable increase of work to perform and then almost immediately fired for expressing concerns about the same in relation to her announcement that she would apply for additional FMLA/RIPFMLA leave, approximately one (1) week, supports an inference of discriminatory and retaliatory intent.

131.    In light of Plaintiff's job performance and history, it is simply not credible that Defendant would terminate her for the reason articulated by Ms. Cabral, rather it is far more likely that Defendant terminated Plaintiff because of her use of FMLA/RIPFMLA leave that Defendant found inconvenient.

### *Motivation and Harm*

132.    Defendant's wrongful and/or unlawful acts and/or omissions, including, but not limited to those described herein, are in violation of the FMLA and/or RIPFMLA and were motivated by malice or ill will toward Plaintiff, and Defendant otherwise acted in bad faith and/or with reckless indifference to the statutorily protected rights of Plaintiff.

133.    As a proximate result of Defendant's wrongful and/or unlawful discriminatory and retaliatory acts and/or omissions, including, but not limited to those described herein, Plaintiff suffered, is now suffering, and will continue to suffer emotional and economic injury, including, but not limited to, pecuniary losses, loss of income, loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to her professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

## VII.    Causes of Action

134.    Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 133 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

### Count One
### Family and Medical Leave Act
### 29 U.S.C. § 2601, *et seq.*
*Interference, Retaliation, and Discrimination*

135.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the FMLA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the FMLA.

### Count Two
### Rhode Island Parental and Family Medical Leave Act
### R.I. Gen. Laws § 28-48-1, *et seq.*
*Interference, Retaliation, and Discrimination*

136.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the RIPFMLA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIPFMLA.

## VIII.    Prayers for Relief

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court grant the following relief:

1.    A declaratory judgment declaring the acts and/or omissions of Defendant, including, but not limited to those complained of herein, to be in violation of the FMLA and/or RIPFMLA.

2.    An injunction or other equitable relief directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.      An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, other compensation and/or benefits, and to make her whole for all earnings and benefits she would have received but for Defendant's unlawful conduct.

4.      An award of compensatory damages.

5.      An award of punitive damages.

6.      An award of liquidated damages.

7.      An award of prejudgment interest, reasonable attorneys' fees, and costs.

8.      Such other and further relief as this Court deems just and proper.

## IX.    Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X.    Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esq. and Danilo A. Borgas, Esq. as trial counsel.

Plaintiff,
By her attorneys,

**SINAPI LAW ASSOCIATES, LTD.**

Dated: February 21, 2025      **/s/Danilo A. Borgas**
**Danilo A. Borgas, Esq. (#9403)**
**Richard A. Sinapi, Esq. (#2977)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401)739-9690
FAX: (401) 739-9040
Email: dab@sinapilaw.com
     ras@sinapilaw.com